# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00713-CV

**Tamara Lynn Ramaker, Appellant**

**v.**

**Jeanette Abbe, Gary Hobbs, Denise Lackey, Shelly Mattson, Stacy McCoy, Anita Paniagua and Amber Ross, Appellees**

## FROM THE COUNTY COURT AT LAW NO. 4 OF WILLIAMSON COUNTY
## NO. 09-0633-CC4, HONORABLE JOHN MCMASTER, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Tamara Lynn Ramaker appeals from the judgment that she take nothing by her claims for breach of contract against appellees Jeanette Abbe, Gary Hobbs, Denise Lackey, Shelly Mattson, Stacy McCoy, Anita Paniagua and Amber Ross, and that appellees recover $5,000 in attorney's fees from her. On appeal, Ramaker challenges the trial court's determinations that the appellees were justified in repudiating their boarding contracts based on a breach by Ramaker and that appellees were entitled to attorney's fees. Ramaker also contends that the trial court erred by concluding that Ross, an instructor who taught horse-riding lessons at appellant's stable, did not breach a Riding Instructor Agreement between them. We will affirm the judgment with respect to the Boarding Contract, reverse the judgment with respect to the Riding Instructor Agreement and the attorney's fees award, and remand this cause to the trial court for further proceedings.

## BACKGROUND

Appellee Ross gave horse-riding lessons for the other appellees and arranged to board appellees' horses at Ramaker's stables. Ross's lessons were covered by a written Riding Instructor Agreement that required Ross to pay a fee when she taught a lesson at Ramaker's stables. The prescribed fee varied depending on the number of students, whether the horses were boarded at Ramaker's stables, and the length of the lesson. The agreement also stated that any additions or changes to the agreement had to be made in writing.

Ross did not pay any fees to Ramaker for lessons she conducted at Ramaker's stables in March 2009. Ross testified that she and Ramaker modified the agreement via email to provide that Ross's obligation to pay lesson fees arose only if the student paid a fee for a particular lesson in addition to the general training fee Ross charged. These emails were not offered as evidence at trial.

The boarding of appellees' horses was covered by a separate written agreement. The Boarding Contract permitted Ramaker to terminate the contract at her discretion, but required boarders to give 30 days written notice before terminating payment. The Boarding Contract also states as follows:

> 12. <u>RULES AND REGULATIONS</u>—The Owner [of a boarded horse] agrees to abide by all the rules and regulations of the Stable and acknowledges receipt of same. Rules are posted on the bulletin boards and are subject to change. Updates will be posted on the bulletin board and/or via e-mail. Observance of the rules is absolutely mandatory and failure to obey the rules will result in Owner and horse(s) being asked to leave the Stables immediately and obtain boarding elsewhere.

The "Safety" section of the stable's rules and regulations states plainly: "No smoking in the barns."

2

After a boarder saw and photographed Ramaker's employee smoking while working in the barn, appellees removed their horses from the stables. They did not give 30 days notice before leaving and did not pay for the month after removing their horses as prescribed by the Boarding Contract.

Appellees filed suit, seeking declarations that (1) the boarding contracts are illusory and/or unenforceable, (2) Ramaker, not appellees, breached the boarding contracts, and (3) appellees do not owe Ramaker under the boarding contract. Ramaker filed counterclaims, alleging that (1) appellees breached their boarding contracts by removing their horses without notice and failing to pay required fees, (2) appellees made promises on which Ramaker relied by hiring workers and buying supplies, (3) appellees Ross and Mattson willfully and intentionally induced the remaining appellees to breach their contracts, (4) appellees conspired to interfere with each others' contracts by organizing the relocation of the horses to another boarding facility, and (5) Ross breached the Riding Instructor Agreement by failing to pay facility-use fees based on the number of lessons given.

After hearing testimony and admitting evidence in a brief bench trial, the trial court rendered a judgment declaring that Ramaker (and not the appellees) breached the riding-instructor agreement and the boarding contracts, concluding that Ramaker take nothing by her counterclaims, and awarding appellees $5,000 in attorney's fees without specifying a basis for the award.

## DISCUSSION

Ramaker contends that the trial court erred by concluding that appellees were justified in repudiating their boarding contracts based on a breach by Ramaker, that Ross did not breach the Riding Instructor Agreement between them, and that appellees were entitled to attorney's fees.

3

In her reply brief, Ramaker asserts that the declaratory judgment act is not a proper vehicle for attorney's fees in this case.

Because this was a non-jury trial in which no findings of fact or conclusions of law were filed, we must presume that the trial court made all the necessary findings to support its judgment. *See Pharo v. Chambers Cnty.*, 922 S.W.2d 945, 948 (Tex. 1996). We must affirm the trial court judgment on any legal theory that finds support in the evidence. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990). In a trial to the court in which no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. *Spir Star AG v. Kimich*, 310 S.W.3d 868, 871-72 (Tex. 2010). When a reporter's record is filed, however, these implied findings are not conclusive, and an appellant may challenge them by raising sufficiency of the evidence issues. *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003). When such issues are raised, the applicable standard of review is the same as that to be applied in the review of jury findings or a trial court's findings of fact. *Roberson v. Robinson*, 768 S.W.2d 280, 281 (Tex. 1989).

**The Boarding Contract**

Ramaker contends that the trial court erred by finding that appellees were justified in repudiating their boarding contracts based on a breach by Ramaker. She contends that appellees failed to show that she materially breached the contract as required to permit their noncompliance with the contract. *See Lazy M Ranch, Ltd. v. TXI Ops.*, *LP*, 978 S.W.2d 678 (Tex. App.—Austin 1998, pet. denied).

When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. *Mustang Pipeline Co. v. Driver*

4

*Pipeline Co*., 134 S.W.3d 195, 196 (Tex. 2004). The covenant breached must be part of mutually dependent promises in order to excuse further performance by the nonbreaching party. *Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982). Generally, the issue of whether a breach rises to the level of a material breach that will render the contract unenforceable presents a dispute for resolution by the trier of fact. *Hiles v. Arnie & Co., P.C.*, 14-12-00088-CV, 2013 WL 2120658, *8 (Tex. App.—Houston [14th Dist.] Apr. 25, 2013, pet. filed) (citing *Cont'l Dredging, Inc. v. De-Kaizered, Inc.*, 120 S.W.3d 380, 394-95 (Tex. App.—Texarkana 2003, pet. denied). The determination of whether a breach is a material breach of the contract necessarily turns on the facts of each case. *Advance Components, Inc. v. Goodstein*, 608 S.W.2d 737, 739 (Tex. Civ. App.—Dallas 1980, writ ref'd n.r.e.) (*citing Bowen v. Briscoe*, 453 S.W.2d 287, 289 (Tex.1970)). Citing the Restatement (Second) of Contracts, section 241 (1981), the Texas Supreme Court noted five circumstances significant in determining whether a failure to perform is material:

> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
>
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances;
>
> (e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Mustang Pipeline*, 134 S.W.3d at 199. Another factor relevant to assessing the materiality of the breach is the extent to which it reasonably appears to the injured party that delay may prevent

or hinder him in making reasonable substitute arrangements. *Id.* (citing Restatement (Second) of Contracts § 242 (1981)).

Although Ramaker did not expressly challenge the sufficiency of the evidence, her complaint that the trial court erred by finding a material breach implicates the sufficiency of the evidence. When reviewing legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We must credit evidence favorable to the trial court's decision if a reasonable factfinder could and disregard all contrary evidence that a reasonable factfinder could ignore. *Id*. at 827. We will sustain a no-evidence complaint when the record shows that (1) there is a complete absence of a vital fact, (2) the court is barred by law or the rules of evidence from considering the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of a vital fact. *Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 228 (Tex. 2011). More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Id*. When a party attacks the factual sufficiency of the evidence on an adverse finding on an issue upon which the other party had the burden of proof, the attacking party must show that the evidence is insufficient to support the finding. *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 201 (Tex. App.—Austin 2005, pet. denied). We must consider and weigh all the evidence, and we should set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Ramaker contends that the prohibition on smoking was not a condition of the contract and that its violation by a stable employee was not material so as to justify cancellation of the contract. She relies on this formulation of the applicable law:

> If the terms of a contract are fairly susceptible of an interpretation which will prevent a forfeiture, they will be so construed. . . . Unless the consideration in a contract is expressed in terms which unmistakably will demand a forfeiture for nonperformance, a mere breach of such terms will not authorize the cancellation of the contract.

*Henshaw v. Texas Natural Res. Found.*, 216 S.W.2d 566, 570 (Tex. 1949); *see also Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987). In a more recent case, the Texas Supreme Court explained further that a "covenant, as distinguished from a condition precedent, is an agreement to act or refrain from acting in a certain way. Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract *unless the breach is a material or total breach*." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (citation omitted) (emphasis added).[1] Forfeitures will be avoided unless contract language admits of no other construction or results in a construction that is unreasonable, inequitable, or oppressive. *Lazy M Ranch*, 978 S.W.2d at 681 (citing *Reilly*, 727 S.W.2d at 530).

---

[1] Ramaker also contends that appellees' claim fails because they proved no damages. Appellees did not seek damages, however, only a declaration that they were excused from further performance by Ramaker's material breach of the contract. The Texas Supreme Court's formulation of the standard for finding a material breach that excuses further performance does not require a finding of actual damages. *See Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.*, 134 S.W.3d 195, 199 (Tex. 2004); *see also Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994).

The trial court concluded that Ramaker materially breached the contract, but did not make written findings or conclusions. We must make findings necessary to support the judgment so long as those findings are supported by the record. *Worford*, 801 S.W.2d at 109.[2]

Legally and factually sufficient evidence supports an implied finding that the safety and security of the horses—specifically, protection from fire caused by cigarette smoking—was part of the contract between the boarders and Ramaker. The Boarding Contract provided that "Stable agrees to provide adequate feed and facilities for normal and reasonable care required to maintain the health and well-being of the horse(s). . . . The standard of care applicable to stable is that of ordinary care of a prudent horse owner." The Boarding Contract incorporates the rules into its terms by providing that the horse owner "agrees to abide by all the rules and regulations of the stable. . . . Observance of the rules is absolutely mandatory and failure to obey the rules will result in Owner

[2] Although there are no written findings of fact or conclusions of law, the court stated the following on the record at the end of the trial

> Now, it is reasonable for the Court to assume that one of the primary reasons that people, or one of the primary concerns that's in peoples' minds when they board their animals, which I understand are precious to them, is that those animals be in a safe, secure place. . . . Ramaker Stables, [made] a rule about no smoking very clear under No. 15 under Safety, you shall not smoke . . . I find that Ms. Ramaker broke her own rule. Her employees act as her agents, they are an extension of her. . . . [The] Court finds that there was a material breach in the contract by Ms. Ramaker causing these people to believe that their animals are no longer housed in a safe and secure location. Therefore, their immediate removal of those animals the Court finds as a reasonable response to that, to what they had witnessed.

This statement contains factual findings not made in the written judgment. We are not bound by the court's oral statement because the written judgment controls over the oral statement. *See Thomas v. Martinez*, 217 S.W.3d 680, 684 (Tex. App.—Dallas 2007, no pet.); *Nine Greenway Ltd. v. Heard, Goggan, Blair & Williams*, 875 S.W.2d 784, 787 (Tex. App.—Houston [1st Dist.] 1994, writ denied). We can, however, infer findings and conclusions that support the judgment and are supported by the record. *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990).

and horse(s) being asked to leave the Stables immediately and obtain boarding elsewhere." The stables would not refund rents paid if the stables requested the boarder to leave. The Ramaker Stables Rules and Regulations stated in its preamble in part as follows: "These rules are an extension of your boarding contract. Non-compliance is a breach of contract. Observance of these rules is absolutely mandatory." The rules are a mix of directives to "you" owners and objective declarations of rules of the stables. There is no provision directly addressing whether stablehands are bound or exempt from the rules, but the clear implication—at least of objectively stated rules—is that all persons at the stables are bound by them. Rule 15 provided in relevant part as follows: "Safety—Absolute[ly] NO GLASS is allowed on the premises. No alcoholic drinking while riding. If any medication you[] are taking states not to drive or may cause[] drowsiness, do not ride either. No smoking in the barns." The smoking ban is not limited to the horse owners but is stated as a general prohibition. The record supports an implicit finding that the smoking ban applied to everyone in the barn, including Ramaker and her employees.

The parties disputed whether the stablehand smoking in the barn was a minor issue or was inconsistent with a core service of the stables—maintaining the health and well-being of the horses as would a prudent horse owner. Ramaker agreed when testifying that her "sole job in taking in other's animals for boarding is to give those animals a safe place to live," and agreed that "fire is a danger to the care and safety of horses." But she asserted that the smoking ban was based on her preference, "not a safety issue." She downplayed the risk posed by the smoking employee, noting that he was standing on a concrete surface—albeit leaning into a stall—and held a garden hose. Ramaker also produced an email from appellee Denise Lackey that Ramaker argues shows that disputes over the proper amount of shavings for Lackey's horse's stall floor were a much bigger

9

factor in Lackey's departure than the smoking incident. Lackey began the email talking about the shavings, but also wrote as follows: "Of even more importance, you also breached your own contract by knowingly allowing your staff and others to smoke in the barn, (witnessed by myself and well documented) where my horse was stalled. This showed a willful disregard for the safety of my horse and my own safety when I was on the premises." Other witnesses characterized the smoking ban as a safety-driven rule. Horse owner Jeanette Abbe testified that "it is very unsafe for a horse to be in an area that they're smoking." Abbe testified that, when she learned a stablehand was smoking on the premises, she decided that her horse had to leave the stables no matter what because of the danger. Her husband, Deryl Abbe, said he was concerned "that the barn could possibly catch fire and my horse, locked in the stable, being unable to be removed." Horse owner Shelly Mattson testified that she panicked when she saw the employee smoking because she felt her horse was in jeopardy. Mattson testified that she also saw Ramaker's boyfriend smoking "out there." When appellees' counsel asked a witness about the dangers of smoking, the court interjected, "As to pitching a match on hay, the Court gets it."

Legally and factually sufficient evidence support an implicit conclusion that the stablehand's violation of the smoking ban was a material breach of the contract. In exchange for the boarders' money, Ramaker agreed to maintain the health and well-being of the horses as would a prudent owner. Smoking was forbidden by what the rules document itself termed a safety rule. The boarders testified that the stablehand's smoking in the barn left them concerned, panicked, and believing that their horses were in danger of being trapped in a burning barn. This supports the trial court's determination that the boarders reasonably expected the Stable to comply with the safety provisions of the contract. The deprivation of the benefit reasonably expected under the contract

10

supports the trial court's finding of a material breach. *See Mustang Pipeline*, 134 S.W.3d at 199 (citing Restatement (Second) of Contracts § 241(a)). The evidence also supports the conclusion that monetary damages would not compensate the boarders. One owner testified that she felt she needed to remove her horse "no matter what" because of the danger. The discrepancy between Ramaker's denial that smoking in the stable was a safety issue—despite the smoking ban being listed in the "safety" paragraph of the rules—and the boarders' concerns about fire supports a view that Ramaker could not cure the problem to the boarders' satisfaction. Ramaker testified that the boarders' departure inflicted unrecoverable losses for customized feed she had already purchased for those horses and wages for an employee she had hired to care for them. The costs imposed on Ramaker by her employee's misdeed, however, are not so substantial as to outweigh the evidence favoring the trial court's finding that the stablehand smoking in the stable was a material breach that excused the boarders from further compliance with the Boarding Contract. *Cf. Mustang Pipeline*, 134 S.W.3d at 199.

In addition to assessing this case pursuant to the Restatement's factors adopted by the supreme court, we conclude that the trial court did not err by implicitly concluding that the contract is not fairly susceptible of an interpretation that bars a forfeiture. *See Henshaw*, 216 S.W.2d at 570. Holding that the violation of the smoking ban was not material would impose an asymmetrical relationship on the parties. The smoking ban is important to the contract—it is a rule that applies without exception and its violation expressly permits immediate termination of the contract by the stable. The failure of the contract to spell out the consequence of smoking by an employee of the stables is not dispositive. The risks posed by smoking in the barn—including, as indicated by the boarders, a fire capable of incinerating the horses in their stalls—are present whether the

11

smoking is attributed to Ramaker or the boarders. The fact that the safety-driven no-smoking rule was violated by an employee of the stables who is responsible for providing services to the horses heightens the seriousness of the breach. There is no evidence presented that supports an interpretation of the contract to have different consequences and remedies depending on which party to the contract smokes in violation of the rules of the stable. To hold that the stables can terminate the contract if a boarder smokes in the barn, but that a boarder lacks that remedy when a stablehand commits the same violation, would be unreasonable, inequitable, and oppressive—factors that indicate material breach. *See Lazy M Ranch*, 978 S.W.3d at 681. The trial court did not err by implicitly concluding that, because violation of the smoking ban was a material breach of the contract, it excused the boarders from further performance under the contract.

**The Riding Instructor Agreement**

Ramaker urges that we render judgment awarding her damages for Ross's breach of the Riding Instructor Agreement. She contends that no evidence supports the trial court's conclusion that Ross did not breach the Riding Instructor Agreement and that the only evidence is that Ross breached it by failing to pay fees for lessons provided at the stables. On appeal, Ross contends that the trial court implicitly found that she and Ramaker modified the Riding Instructor Agreement to permit her to provide lessons without paying Ramaker if the student did not make a payment specifically for the lesson.[3]

---

[3] Ross did not expressly plead that the Riding Instructor Agreement was modified. Contract modification is an affirmative defense, and parties must affirmatively plead any matter constituting an avoidance or an affirmative defense or risk waiving the unpleaded matter. Tex. R. Civ. P. 94; *see Phillips v. Phillips*, 820 S.W.2d 785, 789 (Tex. 1991). An unpleaded issue nevertheless may be deemed tried by consent when evidence on the issue is developed under circumstances indicating that both parties understood the issue was in the case, and the other party

12

The elements of a breach-of-contract cause of action are that (1) a valid contract existed between the parties; (2) one party performed or tendered performance; (3) the other party breached the contract; and (4) the breach damaged the performing party. *See C.W. 100 Louis Henna, Ltd. v. El Chico Rest., L.P.*, 295 S.W.3d 748, 752 (Tex. App.—Austin 2009, no pet.). A modification of a contract must satisfy the elements of a contract: a meeting of the minds supported by consideration. *Hathaway v. General Mills, Inc.*, 711 S.W.2d 227, 228 (Tex. 1986). Whether a contract is modified depends on the parties' intentions and is a question of fact. *Id.* at 228-29. The burden of proving modification rests on the party asserting the modification. *Id.* at 229.

At trial, there was no dispute that the Riding Instructor Agreement was a valid contract, that Ramaker permitted Ross to conduct lessons in her arena in March 2009, and that Ross did not pay for those lessons. Unless Ross was somehow excused from paying facility-use fees for those lessons, Ramaker was damaged in the amounts she was not paid for the lessons conducted.

Ross contends that the following testimony provides the necessary support for her claim of modification:

> A. I had emails back and forth with Ms. Tami Ramaker stating that if my current agreements for my training includes my lesson fees and that if I did not get extra compensation for those lessons then I would not give her compensation. And I had a reply from her where she acknowledged that.

---

failed to make an appropriate complaint. *Emerson Elec. v. American Permanent Ware*, 201 S.W.3d 301, 309 (Tex. App.—Dallas 2006, no pet.). To determine whether an issue was tried by consent, the reviewing court must examine the record, not merely for evidence of the issue, but for evidence of trial of the issue. *Id.* A party who allows an issue to be tried by consent and who fails to raise the lack of a pleading before submission of the case cannot later raise the pleading deficiency for the first time on appeal. *See Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 495 (Tex. 1991). There was some testimony on the issue, but no argument regarding it. Appellant did not reply to appellees' claim that the issue was tried by consent, focusing instead on the merits of the argument. We likewise will address the merits.

13

Q. All right. And that was the method you were operating under, correct?

A. Yes.

Q. Do you owe her any money?

A. No.

No emails concerning payment for lessons were offered or admitted with this testimony.

Ross's testimony lacks any indication of consideration conveyed to Ramaker in exchange for this alleged modification. Consideration is a bargained-for present exchange in return for a promise. *See Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991). When a party agrees to do no more than that which she is already bound to do under an existing contract, the original consideration for the existing contract is not sufficient to support a modification. *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 702 (Tex. App.—Dallas 2008, no pet.). Ross's testimony shows that Ramaker would provide the same service to Ross under the alleged modification as under the Riding Instructor Agreement in return for the same or no compensation. The record contains no evidence of additional consideration provided for this alleged modification and thus no evidence to support any implicit finding that the parties properly modified the Riding Instructor Agreement to excuse Ross from paying Ramaker facility-use fees for lessons conducted in Ramaker's arena during March 2009. We must reverse the judgment denying Ramaker recovery on her claim that Ross breached the Riding Instructor Agreement.

Ramaker contends that we must render judgment in her favor based on the evidence of breach of the Riding Instructor Agreement. Ross admitted that she taught lessons in March and did not pay Ramaker for them. The trial court admitted a "Lessons Board" on which

14

instructors wrote their names indicating when they had taught lessons. Ross's name appears on that calendar eight times in March.

The record does not provide sufficient information for us to render judgment, however. The Riding Instructor Agreement sets out different amounts of fees due depending on such factors as the length of the lesson, the number of students, and the boarding status of the student.[4] The Lessons Board lists starting times for eight training sessions adjacent to appellant's name, but lists a scheduled ending time for at most three of them, and contains no information about how long the sessions actually lasted. It contains no information about the students—how many there were or whether they were boarders. Lacking this information, we cannot calculate the fees allegedly due based on the rates listed in the Riding Instructor Agreement. Because we cannot calculate this unliquidated damages amount, we must remand the entire issue of the breach/modification of the Riding Instructor Agreement for a new trial. *See* Tex. R. App. P. 44.1(b).

**Attorney's fees**

Ramaker contends that the trial court erred by awarding attorney's fees to appellees because they are based on what she argues is an erroneous judgment. Although we are affirming the judgment with respect to claims concerning the Boarding Contract, we are reversing and remanding the judgment with respect to claims relating to the Riding Instructor Agreement. The trial court awarded attorney's fees to appellees without apportioning the award based on claim or individual appellee. Because we are reversing and remanding a portion of the judgment on which

---

[4] The Riding Instructor Agreement set out the following fee structure: for a half-hour lesson; $5; for one-hour lessons for boarders, $10 for a private lesson, $7.50 per person for a semi-private lesson up to four boarders; and for non-boarders, $15 for a private lesson and $10 per person for a semi-private lesson.

the attorney's fees award was based for further proceedings—a portion of the judgment that involves only one appellee, Ross—we also reverse the award of attorney's fees and remand that issue for reconsideration following further proceedings.

## CONCLUSION

We affirm the judgment with respect to claims concerning the Boarding Contract. We reverse that portion of the judgment finding that Ramaker take nothing on her claim that Ross breached the Riding Instructor Agreement and remand that issue for further proceedings. We also reverse the award of attorney's fees and remand that issue for further proceedings.

_____

Jeff Rose, Justice

Before Justices Puryear, Pemberton, and Rose

Affirmed in part; Reversed and Remanded in part

Filed:   July 18, 2013

16